UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KENDRA R. WILSON, ) | |
|     Plaintiff, ) | |
| ) | |
| vs. ) | 1:08-cv-660-RLY-TAB |
| ) | |
| JASON GRABLE and CITY OF ) | |
| GREENWOOD, INDIANA, ) | |
|     Defendants. ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Kendra Wilson ("Plaintiff"), brings this case under 42 U.S.C. § 1983 ("Section 1983") against Jason Grable ("Officer Grable"), a member of the Greenwood Police Department ("GPD"), for violating her Fourth Amendment right to be free from an unreasonable search and seizure. She also brings state law claims under the Indiana Tort Claims Act ("ITCA") for false imprisonment, illegal search, intimidation, and intentional infliction of emotional distress against the City of Greenwood, Indiana (the "City"). Officer Grable and the City (collectively the "Defendants") now move for summary judgment. For the reasons set forth below, the court **GRANTS** in part, and **DENIES** in part, Defendants' motion.

**I.   Factual Background**

On July 10, 2007, Plaintiff and her boyfriend at the time, Daniel Bell ("Bell"), got into an argument. (Deposition of Kendra Wilson ("Plaintiff Dep.") at 25). At

approximately 12:30 p.m., Bell placed a 911 call for police assistance. (*Id*. at 34). In response to this type of request, the GPD has two officers respond to the scene. (Deposition of Jason Grable ("Grable Dep.") at 36). Officer Grable and Officer Prior responded to the call within approximately five minutes. (Plaintiff Dep. at 41; Grable Dep. at 52).

  Bell answered the door in response to Officer Grable's knock, and Officer Grable asked Bell to step outside with him onto the front porch of the home to ask him a few questions. (Grable Dep. at 51-52; Plaintiff Dep. at 42). Bell stated he and Plaintiff had gotten into a verbal argument and he wanted to take their child with him away from the home. (*Id*.). Bell indicated he felt Plaintiff was not a fit mother. (*Id*.). During this conversation, Officer Prior was present and observed the interview. (Grable Dep. at 53). Officer Grable then reentered the home while Officer Prior escorted Bell to his vehicle. (*Id*. at 55-56).

  Officer Grable then questioned Plaintiff in her bedroom. Plaintiff reported she and Bell had gotten into an argument and Bell wanted to leave with their infant daughter. (Plaintiff Dep. at 43). The officer then asked Plaintiff if she had any weapons or drugs on her person, to which Plaintiff responded, "On me personally, no. In the living room we do have two marijuana smoking pipes." (*Id*. at 67). Officer Grable then looked around Plaintiff's bedroom from where he was standing and observed a white pill on her dresser. (*Id*. at 43-44). The officer asked Plaintiff what type of medication the pill was, to which Plaintiff responded, "ibuprofen." (*Id*. at 44). Officer Grable then instructed Plaintiff to

flush the pill, and informed her it was a felony to possess a prescription pill outside of its case. (*Id*. at 45). Plaintiff then flushed the pill down the toilet. (*Id*. at 46).

Upon Plaintiff's return to her bedroom, Officer Grable proceeded to conduct a search of Plaintiff's person while she was standing next to her bed. (Affidavit of Kendra Wilson ("Plaintiff Aff.") ¶ 3; Plaintiff Dep. at 166). Immediately before the search began, Officer Grable informed her that he would not be allowed to touch her while searching for contraband, so she would have to do it herself. (Plaintiff Dep. at 47). During the search, Plaintiff's two daughters, ages 18 months and 3 months, were on the bed right behind her. (*Id*. at 51).

The search began with Officer Grable requesting Plaintiff to take her tank top off and shake it, which she did. (*Id*. at 47). Officer Grable then asked Plaintiff to make a fist, put it inside the belt area of her jeans, and move her fist in a circular motion. (*Id*. at 48). Because Plaintiff's jeans were tight, she was unable to get her fist between her skin and the jeans. (*Id*. at 49). Officer Grable then asked her to unbutton her pants and fold the flaps of them down onto the pockets. (*Id*.). Plaintiff did so, forming a "V" in the middle. (*Id*.). Officer Grable asked Plaintiff to pull her pants down far enough to provide access to the "crotch of her underwear." (*Id*. at 50). Officer Grable then asked her to shake her underwear. (*Id*.). In response to his command, Plaintiff pulled her pants down to her knees, grabbed the crotch of her underwear and shook it. (*Id*.). Officer Grable then asked her to turn around, pull her underwear down and bend over, so she did. (*Id*.). Specifically, Plaintiff pulled her underwear down to where her pants were, below her

knees. (*Id*.).

Plaintiff then pulled her underwear and pants up and turned around to face Officer Grable. (*Id*. at 54). At that point, Officer Grable asked her to pull her pants down again while facing him. (*Id*.). Specifically, Plaintiff states Officer Grable told her to "drop 'em." (*Id*.). He then asked Plaintiff to spread her knees at that point. (*Id*.). Officer Grable said, "okay," and Plaintiff pulled her pants back up. (*Id*.). Officer Grable then asked Plaintiff if that was as far away from her chest that she could get her shirt, in response to which Plaintiff unfastened the back of her bra. (*Id*. at 55). Officer Grable asked her to raise her shirt up and shake it, and to grab the wiring of her bra and shake it. (*Id*. at 56). In response to this request, Plaintiff pulled her shirt up to her bra line, pulled it away from her chest, and shook both the bra and her shirt. (*Id*.). Plaintiff does not know whether or not Officer Grable saw her breasts, but does recall that the tank top was still covering the upper part of her breasts. (*Id*.). Plaintiff then shook the shirt for a few seconds, at which point Officer Grable said okay and she pulled her shirt back down. (*Id*.). Plaintiff acknowledges that Officer Grable never told her that she was not free to leave during the investigation. (*Id*. at 147). However, Plaintiff testified that Officer Grable was standing in the doorway to her bedroom, blocking her ability to leave her bedroom. (*Id*. at 168). Moreover, Officer Grable told her that having a pill outside of its case was a felony, and she was afraid of going to jail and "los[ing] [her] kids." (*Id*.).

Plaintiff recalls a second officer present at the scene (Officer Prior) leaned into a doorway of Plaintiff's bedroom and spoke to Officer Grable. (*Id*. at 58). Officer Grable

responded to the officer and went into the hallway. (*Id*. at 59). Plaintiff followed Officer Grable into the hallway, whereupon he asked her if he could have consent to go through her purse. (*Id*. at 60). Plaintiff gave him consent to search her purse, and the Officer found a Xanax pill and rolling papers inside of it. (*Id*. at 59-60). Officer Grable asked Plaintiff if the Xanax and papers were hers, to which she responded no. (*Id*. at 63). Plaintiff admits that neither she nor Bell had a prescription for Xanax, but that they bought it together the night before the incident. (*Id*. at 65). After Officer Grable found the Xanax and rolling papers, he asked Plaintiff if there was anything else in her apartment. (*Id*. at 66). Plaintiff again reported that there were two smoking pipes that were kept in the corner of the room on the shelf. (*Id*.). Officer Grable then asked Plaintiff to retrieve the pipes, and she did so. (*Id*. at 68). As Officer Grable made this request, Plaintiff's grandfather, Phillip Wilson, whom she had called prior to Bell's 911 call, arrived at the apartment. (*Id*. at 69).

Officer Grable told Plaintiff's grandfather that he was not going to put the found objects into the police report; rather, he would take the items and get rid of them. (*Id*. at 73). In response to this statement, Plaintiff's grandfather asked Officer Grable to give him the items so he could destroy them. (*Id*.). At that point, Plaintiff's grandfather grabbed a grocery bag out of her kitchen, put the two smoking pipes into the bag, and destroyed them with a hammer. (*Id*.). Officer Grable threw away the glass smoking pipes, the Xanax pill and the rolling papers he found in her purse. (Grable Dep. at 44).

Officer Grable prepared an incident report which he filed with the GPD. (*Id*. at

17-18; Grable Dep. Ex. 2). The report gives a narrative summary of the domestic dispute between Plaintiff and Bell; however, it does not mention the search he conducted on Plaintiff's person or the drug paraphernalia and Xanax pill which he took from the apartment. (Grable Dep. Ex. 2). During his deposition, Officer Grable was asked why he did not include all of the events that occurred that day in his report, to which he responded, "Because I – because it became unfounded. Are you talking about the search for drugs?" (Grable Dep. at 40). He then elaborated on his answer as follows: "I decided to give [Plaintiff] the benefit of the doubt because she was a single mother and had two children. I probably could have arrested her that day, but decided not to." (*Id.*).

After the incident, Plaintiff hired counsel and went to the GPD to request an internal affairs investigation. (Plaintiff Dep. at 92-94).

## II.    Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant. *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992). The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003). The moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The non-moving party may not, however, simply rest on the pleadings, but must demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *Green v. Whiteco Industries, Inc.*, 17 F.3d 199, 201 (7th Cir. 1994) (citing *Celotex*, 477 U.S. at 322)).

### III.  Discussion

#### A.  Section 1983 Search and Seizure Claim

Plaintiff brings her Fourth Amendment claim under Section 1983. That section provides a private cause of action against a person, who acting under color of state law, deprives an individual of any "rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (quoting 42 U.S.C. § 1983). "Section 1983 is not itself a font for substantive rights; instead it acts as an instrument for vindicating federal rights conferred elsewhere." *Spiegel v. Rabinovitz*, 121 F.3d 251, 254 (7th Cir. 1997). Plaintiff alleges that her Fourth Amendment rights were violated when Officer Grable required her to submit to a strip search and visual body cavity search. She seeks to vindicate these rights by virtue of this lawsuit.

Officer Grable asserts the defense of qualified immunity. Whether a defendant is entitled to qualified immunity requires a two-step analysis. *Payne v. Pauley*, 337 F.3d 767, 775-76 (7th Cir. 2003). First, the court must determine, considering the facts in the light most favorable to the plaintiff, whether defendant's conduct violated a constitutional right. *Id*. at 775. If so, the court must determine whether the right that the defendant violated was clearly established at the time of the alleged injury. *Id*. Although the privilege of qualified immunity is a defense, Plaintiff carries the burden of defeating it. *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003). The court will begin its analysis with whether Plaintiff's constitutional rights[1] were violated.

### 1. Constitutional Violation

The first issue presented is whether a police officer violates an individual's Fourth Amendment rights by requiring that individual, who is not under arrest for a crime, to submit to a warrantless strip search and visual body cavity search. This very issue was previously addressed by this court in *Gray v. City of Columbus*, 2000 WL 683394 (S.D. Ind. Jan. 31, 2000). In that case, the plaintiff and her twenty-two month old son were passengers in a car. *Id*. at * 1. An officer pulled the car over for having a cracked windshield, and found burnt marijuana joints between the driver's seat and the passenger seat. *Id*. The officer arrested the driver and transported plaintiff and her son to the police

---

[1] In *Pearson v. Callahan*, the United States Supreme Court held that the district judge has the discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first. – U.S. – , 129 S.Ct. 808, 818 (2009). Here, the court finds that the constitutional analysis should be addressed first.

station. *Id*. Plaintiff and her son were not arrested. *Id*. While at the station, a female officer ordered plaintiff and her son to submit to strip and body cavity searches in the bathroom. *Id*. The court held that the searches were unconstitutional: "the suggestion that American law enforcement officers have the authority, without a search warrant, to use the power of their badges and uniforms to conduct a strip search and body cavity search of a person who is not under arrest is simply stunning." *Id*. at *10.

Although *Gray* was decided in 2000, it is an accurate description of the law in the Seventh Circuit regarding strip-searches. Indeed, the Seventh Circuit has approved the warrantless strip-search of an individual under three circumstances: (1) the individual was under arrest, (2) the individual was at an international border, or (3) the individual was a student in school. *See Campbell v. Miller*, 499 F.3d 711, 718 (7th Cir. 2007) (holding that strip-search incident to arrest was not *per se* unreasonable when supported by a reasonable suspicion that contraband would be found, but holding that search was performed in an unreasonable manner when conducted in public view); *Saffell v. Crews*, 183 F.3d 655 (7th Cir. 1999) (customs inspector entitled to qualified immunity for strip-search at international airport's customs checkpoint); *Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1323 (7th Cir. 1993) (school officials did not violate sixteen-year old student's constitutional rights when they strip-searched him based on a reasonable suspicion that he was concealing drugs); *see also Lessley v. City of Madison, et al.*, No. 4:07-cv-136 (S.D. Ind. Aug. 21, 2009), Entry on Pending Motions at 24 (reaffirming the holding in *Gray* that the warrantless strip-search of an individual who is

9

not under arrest violates that individual's Fourth Amendment rights). But even a lawful arrest does not necessarily justify a strip-search. *See Mary Beth G v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983) (holding that city's policy of performing a custodial strip-search of women arrested for misdemeanors without a reasonable suspicion that the women were concealing contraband was unconstitutional). To justify this type of invasive search, the arresting officer must have at least a reasonable suspicion that the arrestee is hiding contraband. *Campbell*, 499 F.3d at 716-18.

In the present case, it is undisputed that Plaintiff was not under arrest at the time Officer Grable subjected Plaintiff to a warrantless strip-search and visual body cavity search. The fact that Officer Grable may have had some basis to believe that Plaintiff was hiding contraband in or on her person does not justify his actions. *See Gray*, 2000 WL 683394, at * 8 (citing *Doe v. Renfrow*, 631 F.2d 91 (7th Cir. 1980)), for the proposition that "in the absence of an arrest, a warrantless strip search, let alone an even more intrusive body cavity search, violates the Fourth Amendment even when there may be some basis to suspect contraband"). For these reasons, the court finds that Officer Grable's invasive search of Plaintiff's person violated Plaintiff's Fourth Amendment rights against unreasonable searches and seizures.

### 2. Qualified Immunity

Having found that Officer Grable violated Plaintiff's Fourth Amendment rights, the court must next determine whether he is entitled to qualified immunity. As noted above, this requires the court to determine whether Officer Grable violated a clearly

established constitutional right. "A clearly established right is one where the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Jacobs v. City of Chicago*, 215 F.3d 758, 766-67 (7th Cir. 2000) (internal quotations and citations omitted).

Neither party has cited to the court a case directly on point. However, "binding precedent is not necessary to establish a right." *Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000); *Donovan v. City of Milwaukee*, 17 F.3d 944, 952 (7th Cir. 1994) ("In ascertaining whether a particular right has been 'clearly established' . . . this court has not required binding precedent from the Supreme Court or the Seventh Circuit."). A plaintiff can defeat qualified immunity by showing that "the violation was so clear that a government official would have known that his actions violated the plaintiff's rights even in the absence of a factually similar case." *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008).

As noted above, this court in *Gray* held that it was clearly established that a warrantless strip-search not incident to arrest is unconstitutional. While a district court opinion does not clearly establish law, *see Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995), *Gray* accurately describes the Seventh Circuit opinions ( i.e., *Campbell*, *Mary Beth G.*, etc.) which establish the circumstances where a warrantless strip-search may be permissible: incident to arrest, at a border, or at school. None of these circumstances were present here.

The court finds that, even in the absence of controlling authority directly on point,

11

a reasonable police officer would know that a warantless strip-search of a plaintiff who was not under arrest is unreasonable.  This legal finding is further supported by the fact that, in this case, Officer Grable's search was contrary to the GPD's policy.  The policy states that, in the absence of exigent circumstances, a cursory search of an arrestee must be made by an officer of the same sex.  (Grable Dep. at 33-34; Grable Dep. Ex. 3).  For these reasons, the court finds that Officer Grable is not entitled to qualified immunity.  Defendants' Motion for Summary Judgment on Plaintiff's Section 1983 unreasonable search claim is therefore **DENIED**.

      **B.**    **State Law Claims**

The court now turns to Plaintiff's state law claims against the City for false imprisonment, illegal search, intimidation, and intentional infliction of emotional distress.  The City claims that Officer Grable is entitled to law enforcement immunity under the Indiana Tort Claims Act.  The Indiana Tort Claims Act ("ITCA") provides immunity from liability to governmental employees acting within the scope of their employment if a loss results from "[t]he adoption and enforcement of or failure to adopt or enforce a law . . . unless the act of enforcement constitutes false arrest or false imprisonment."  IND. CODE § 34-13-3-3(8).  As immunity does not attach to Plaintiff's claim for false imprisonment, the court will begin its discussion with that claim.  Moreover, because the court finds that Plaintiff's other state law claims for intentional infliction of emotional distress, illegal search, and intimidation fail on the merits, the court need not reach the City's defense of immunity.

### 1. False Imprisonment

Under Indiana law, false imprisonment is defined as "'an unlawful restraint upon one's freedom of locomotion or the deprivation of liberty of another without [her] consent.'" *Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958, 967 (Ind. Ct. App. 2001) (quoting *Crase v. Highland Village Value Plus Pharmacy*, 374 N.E.2d 58, 60-61 (1978)). "'False imprisonment may be committed by words alone, or by acts alone, or by both and by merely operating on the will of the individual, or by personal violence, or both." (*Id.*) (quoting 35 C.J.S. *False Imprisonment* § 14, at 444 (1999)).

Plaintiff testified that Officer Grable informed her that it was a felony to have a pill outside of its case. Therefore, she feared that if she did not submit to Officer Grable's request for a strip-search and visual body cavity search, she would go to jail and possibly "lose her kids." Moreover, during the search, Officer Grable was standing at the entrance to her bedroom, thereby physically blocking her ability to leave her bedroom. The court finds that there are sufficient facts in the record for a reasonable jury to find that Officer Grable's statements to Plaintiff, by virtue of the authority he held as a law enforcement officer, coupled with his physical placement at the entrance to her bedroom, restricted Plaintiff's freedom of movement during the highly intrusive and unconstitutional search of her person without her consent. Accordingly, Defendants' Motion for Summary Judgment on her false arrest claim is **DENIED**.

### 2. Intentional Infliction of Emotional Distress

The tort of intentional infliction of emotional distress arises when "a defendant (1)

13

engages in 'extreme and outrageous' conduct that (2) intentionally or recklessly (3) causes (4) severe emotional distress to another." *Creel v. I.C.E. & Assoc., Inc.*, 771 N.E.2d 1276, 1282 (Ind. Ct. App. 2002) (citing *Bradley v. Hall*, 702 N.E.2d 747, 752 (Ind. Ct. App. 1999)). "Liability has been found only where the conduct has been so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, as to be regarded as atrocious, and utterly intolerable in a civilized society." Restatement (Second) of Torts § 46. Further, the conduct must "cause mental distress of a very serious kind." *Creel*, 771 N.E.2d at 1282.

 Here, Officer Grable conducted a strip-search and visual body cavity search of Plaintiff's person based on his suspicion of the presence of contraband. The search was brief and did not involve any physical contact between Officer Grable and Plaintiff. Plaintiff was understandably humiliated and upset over the incident because the search was performed in front of her two young children. However, Plaintiff has not pointed to any testimony which establishes that she suffered from extreme emotional distress. Ironically, the City cited to her deposition testimony which revealed that she did go to counseling approximately six times. Her later visits with her counselor, though, involved discussions about her relationship with Bell. (Plaintiff Dep. at 126-27). Because no evidence has been submitted supporting a claim of "mental distress of a very serious kind," Plaintiff's claim for intentional infliction of emotional distress must be dismissed. Defendants' Motion for Summary Judgment on her intentional infliction of emotional distress claim is **GRANTED**.

### 3. Other State Law Claims

Plaintiff also purports to bring state law claims of illegal search and intimidation. She does not support these claims with argument or evidence. Accordingly, Defendants' Motion for Summary Judgment on these state law claims is **GRANTED**.

## IV. Conclusion

For the reasons set forth above, the court **GRANTS** in part, and **DENIES** in part, Defendants' Motion for Summary Judgment. The court **GRANTS** Defendants' motion with respect to Plaintiff's state law claims for intentional infliction of emotional distress, illegal search, and intimidation. The court **DENIES** Defendants' motion with respect to Plaintiff's Section 1983 unreasonable search claim and with respect to her state law claim for false imprisonment.

**SO ORDERED** this  2nd   day of March 2010.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana


Electronic copies to:

Cara MacKell Chittenden
HUME SMITH GEDDES GREEN & SIMMONS
cchittenden@humesmith.com

C. Dennis Wegner
C. DENNIS WEGNER & ASSOCIATES,P.C.
dennis@wegnerlegal.com

Andrew P. Wirick
HUME SMITH GEDDES GREEN & SIMMONS
awirick@humesmith.com